# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION:

TINA M. HARTSON,

      Plaintiff,

vs.

LINDA S. McMAHON,[1] Commissioner
of Social Security,

      Defendant.

No. C06-0026

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On May 26, 2006, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(C) (docket number 5). The court finds in favor of the defendant and the matter is dismissed.

## PROCEDURAL BACKGROUND

On November 20, 2002, Plaintiff Tina M. Hartson applied for Social Security benefits under Title II and Part A of Title XVIII of the Social Security Act. (Tr. 58-60). She also protectively filed for Supplemental Security Income benefits under Title XVI of the Social Security Act on October 18, 2002. (Tr. 279). Ms. Hartson alleged an inability to work since August 1, 2002, due to depression, bipolar disorder, hearing voices, loss of memory, Attention Deficit Hyperactivity Disorder (ADHD), and a learning disability. (Tr. 72). Her application was denied originally and on reconsideration. (Tr. 46, 52-55).

---

[1]As of January 22, 2007, Linda S. McMahon became Acting Commissioner of Social Security. She should be substituted as the defendant on further orders in all pending Social Security cases. See FED. R. CIV. P.29(d)(1).

Ms. Hartson requested a hearing and on January 12, 2005, she appeared before Administrative Law Judge Thomas M. Donahue (ALJ). (Tr. 18). In an opinion dated May 19, 2005, the ALJ denied benefits. (Tr. 18-27). Following the decision, Ms. Hartson requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (Tr. 13). On December 29, 2005, the Appeals Council denied Ms. Hartson's request to review the decision. (Tr.7). Following this denial, Ms. Hartson brought this action for judicial review on March 1, 2006 (docket number 3).

## FACTUAL BACKGROUND

Ms. Hartson was born on January 12, 1972. (Tr. 58). She testified at the ALJ hearing that she was in special education classes throughout her school experience due to slow learning and hyperness. (Tr. 302). Education records from Wilson Jr. High School and the Grant Wood Area Education Agency (Grant Wood AEA) show that Ms. Hartson was considered for special education placement as early as 1979 and placed in special education in 1983, her fourth grade year, for mental disabilities. (Tr. 95, 108).

Ms. Hartson's special education "Staffing Report" from 1983 shows that Ms. Hartson's IQ was evaluated on two occasions. (Tr. 108-09) In 1978, Ms. Hartson took the Wechsler Intelligence Scale for Children - Revised (WISC-R) and scored a Verbal IQ of 72, Performance IQ of 81, and Full-Scale IQ of 80. (Tr. 109). In January 1983, she took the WISC-R again and received corresponding scores of 81, 78, and 78. (Tr. 109). The Staffing Report stated that Ms. Hartson had "very poor" reading comprehension and struggled with math, as she counted on her fingers and possessed "[n]o reasoning skills for problem solving." (Tr. 109). Additionally, the report stated that Ms. Hartson had behavioral problems that included "striking out constantly at any behavior she thought others exhibited against her." (Tr. 109). A school psychologist evaluated Ms. Hartson in 1983 and reported that she had "deficit areas [] present and need[ing] attention." (Tr. 172).

In 1985, when Ms. Hartson was 13 years old, the Grant Wood AEA reevaluated her special education placement. (Tr. 174-75). She took the WISC-R again and scored a Verbal IQ of 72, Performance IQ of 90, and Full-Scale IQ of 90. (Tr. 174-75). The school psychologist recommended that Ms. Hartson remain in special education due to her below average measured intelligence, depressed academic skills, and struggles with social adaptability. (Tr. 174). Ms. Hartson dropped out of school after the ninth grade. (Tr. 198).

After dropping out of school, Ms. Hartson worked as a flagger, housekeeper, and home-health aid for her husband's aunt. (Tr. 73, 313-14). In 1989 and 1992, Ms. Hartson filed applications for supplemental security benefits alleging an onset of disability from her birth date, January 12, 1972. (Tr. 18). These applications were denied. (Tr. 18). In 1998, she filed an additional application for supplemental security benefits, this time alleging an onset of disability as of April 1, 1997. (Tr. 18). This application was also denied. (Tr. 18).

On September 24, 2002, Ms. Hartson sought treatment for bipolar disorder at the Abbe Center for Community Mental Health (Abbe Center). (Tr. 185). Staff Psychiatrist Dr. Collyer Ekholm evaluated Ms. Hartson for 60 minutes and performed an intake assessment. (Tr. 186). The intake assessment states that Ms. Hartson complained of irritability, difficulty sleeping, and racing thoughts. (Tr. 185-86). It also states Ms. Hartson specifically claimed "past similar episodes and symptoms made it difficult for her to have a job." (Tr. 186). Dr. Ekholm noted that Ms. Hartson denied psychotic symptoms, that her intellect appeared normal, and that her immediate, recent, and remote memory appeared intact. (Tr. 186). Dr. Ekholm concluded that Ms. Hartson suffered from bipolar disorder and hypomania and assigned her a Global Assessment of Functioning (GAF) of 50. (Tr. 186). Dr. Ekholm prescribed Trileptal, a mood stabilizing agent, for Ms. Hartson and requested that she return to the Abbe Center in one month. (Tr. 186).

One month later, on October 15, 2002, Dr. Ekholm and Ms. Hartson met again for a 15-minute session. (Tr. 187). Ms. Hartson reported that she continued to suffer from rapid mood cycles and periods of crying for no reason. (Tr. 187). Dr. Ekholm increased the prescribed dosage of Trileptal and requested that Ms. Hartson return in three months (Tr. 187).

The following night, October 16, 2002, Ms. Hartson was hospitalized overnight for suicidal ideation with intent and plan. (Tr. 188). Dr. Ekholm examined her again and this time, Ms. Hartson admitted to longstanding difficulty with auditory hallucinations and a number of visual hallucinations. (Tr. 190). Ms. Hartson confessed that she had not been truthful with Dr. Ekholm in their earlier meetings and stated that she had a fight with her husband prior to coming to the hospital. (Tr. 190-91). Dr. Ekholm observed that Ms. Hartson's "intellect appear[ed] within normal limits" and that her "immediate, recent, and remote memory appear[ed] intact." (Tr. 191). However, Dr. Ekholm also stated that "long-term judgment is I think an open question in this woman." (Tr. 191). Dr. Ekholm diagnosed psychosis and bipolar disorder and prescribed another drug, Zyprexa, to counteract the psychosis. (Tr. 191). Dr. Ekholm requested a follow-up appointment and a therapist for Ms. Hartson. (Tr. 191). Dr. Ekholm also assigned a GAF of 20 when Ms. Hartson was admitted to the hospital and 40 when she was dismissed. (Tr. 191).

Dr. Ekholm met with Ms. Hartson again on November 8, 2002 for 15 minutes. (Tr. 194). Ms. Hartson reported improvement; however, she stated that she still "felt pretty fragile and unable to do much more than take care of herself." (Tr. 194). She claimed the voices were better and that she was sleeping at night. (Tr. 194). She also told Dr. Ekholm that she and her husband had custody of a friend's child and that the child was having severe behavioral problems. (Tr. 194). Dr. Ekholm continued the prescriptions of Trileptal and Zyprexa and reminded Ms. Hartson that she "need[ed] to contact Linn County Medication Supplementation about whether they would pay for her medicine." (Tr. 194). Dr. Ekholm planned to see Ms. Hartson again in a month. (Tr. 194).

Dr. Ekholm and Ms. Hartson met again in December 2002 for another 15-minute session. (Tr. 197). This time, Ms. Hartson said she was without her medicine for several weeks "because her husband kicked her out their house." (Tr. 197). Ms. Hartson claimed she had not been sleeping well, but Dr. Ekholm commented that Ms. Hartson's mental status appeared to be unchanged from what it had been in their previous meeting. (Tr. 197). Dr. Ekholm also told Ms. Hartson that "she need[ed] to actually keep her appointments with her therapist" so that they could discuss issues. (Tr. 197). Ms. Hartson claimed to be going to the free clinic that same day to inquire about help paying for her medicine. (Tr. 197). Dr. Ekholm upped the dosage of Zyprexa and requested a meeting in one month. (Tr. 197).

On January 12, 2003, the Disability Determination Service referred Ms. Hartson to Dr. Owen Duffy for a Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) IQ test. (Tr. 198). Ms. Hartson took the test and scored a Verbal IQ of 61, Performance IQ of 64, and Full-Scale IQ of 59. (Tr. 199). According to Dr. Duffy's report, these scores placed Ms. Hartson within the mild range of mental retardation. (Tr. 200).

Dr. Duffy also performed a psychological evaluation of Ms. Hartson. (Tr. 198-200). In the section marked "Background Information," Ms. Hartson said that she was fired from her job at a factory because "she could not get along with colleagues and could not accept authority from supervisors," as a flagger for "making sudden outbursts at passing motorists," as a housekeeper "because she was unable to get along with colleagues," and as a home-health aide for "yelling and screaming" at her aunt. (Tr. 198). Ms. Hartson also claimed that she was unable to handle money as she "blows it" when she has it. (Tr. 198). In the section marked "Mental Status," Dr. Duffy noted that Ms. Hartson's memory appeared grossly intact, her thoughts were organized and coherent, and her concentration and attention were adequate for her ability. (Tr. 199). However, Dr. Duffy called Ms. Hartson's judgment and insight "questionable." (Tr. 199).

In Dr. Duffy's "Test Observations," Dr. Duffy noted that Ms. Hartson was unable to do the simplest computation, using her fingers to do oral arithmetic. (Tr. 199). Dr. Duffy interpreted the test to conclude that Ms. Hartson was "within the Mild range of mental retardation" and "far below average in immediate auditory memory, general fund of information, and spatial motor reasoning." (Tr. 200). Dr. Duffy also found that Ms. Hartson had severe weaknesses in social judgment, social reasoning, and in "her ability to structure social situations while anticipating cause and effect." (Tr. 200). Dr. Duffy assigned Ms. Hartson a GAF of 55, which he thought to be her highest GAF throughout the past year. (Tr. 200). Dr. Duffy also concluded that Ms. Hartson needed a payee to manage any benefits she could qualify for because of she was unable to add or subtract at the most basic level and had a history of spending money before paying bills. (Tr. 200).

On January 23, 2003, Ms. Hartson met with Dr. Ekholm for a 15-minute session. (Tr. 201). Ms. Hartson reported improvement as she was sleeping at night and only had two inappropriate outbursts in the previous month. (Tr. 201). She also said that the free clinic had her on a three-month program to get medication. (Tr. 201). Dr. Ekholm continued the medication and scheduled another one-month appointment. (Tr. 201).

On February 11, 2003, Ms. Hartson began therapy at the Abbe Center with Patricia Jones. (Tr. 222). In the initial evaluation, Ms. Jones noted Ms. Hartson's claims of continued mood swings, lack of concentration, and discouragement. (Tr. 222). This was despite Ms. Hartson's admitted improvement from the medicine Dr. Ekholm prescribed. (Tr. 222). Ms. Hartson also spoke to Ms. Jones of past experiences of physical, emotional, and sexual abuse, stress-related eating disorders, problems concentrating, conduct disorder, guilt, loss of interest in activities, nightmares, and hallucinations. (Tr. 223-24). She told Ms. Jones that she was diagnosed with ADHD as a child and that as a teenager she put a gun to her neck with thoughts of suicide. (Tr. 223-24). Ms. Hartson also told Ms. Jones of a manic episode where she planned to kill herself and

her husband and then went out, opened a bank account, and wrote $4000-$5000 worth of bad checks. (Tr. 223-24). Ms. Jones's report, however, states that at times she questioned the accuracy and time frame of Ms. Hartson's stories. (Tr. 224). At the conclusion of her report, Ms. Jones stated that she felt Ms. Hartson "appear[ed] sufficiently motivated," and had "adequate intellect to deal with therapy." (Tr. 227). Ms. Jones gave Ms. Hartson a GAF of 50 and recommended bi-monthly, 60-minute meetings. (Tr. 228).

Ms. Hartson continued to meet with Dr. Ekholm and Ms. Jones. (Tr. 229, 230). On February 21, 2003, Dr. Ekholm reported that Ms. Hartson was "doing fairly well" with her medicine and did not report any negative behavior. (Tr. 229). On March 17, 2003, Ms. Jones and Ms. Hartson discussed Ms. Hartson's past abuse. (Tr. 230-31). Ms. Jones recommended that Ms. Hartson contact a Sexual Abuse Center about support groups, write a letter to her husband about his abuse, and keep her next appointment with Dr. Ekholm. (Tr. 231). Ms. Hartson kept her appointment and met with Dr. Ekholm for 15 minutes on March 21, 2003. (Tr. 232). Dr. Ekholm increased the dosage of Zyprexa because Ms. Hartson was not sleeping well. (Tr. 232). Dr. Ekholm did not, however, report any other negative changes. (Tr. 232).

Ms. Hartson met with Ms. Jones for 60 minutes on April 1, 2003. (Tr. 233). Ms. Hartson claimed to have forgotten to write the letter to her husband and Ms. Jones instructed her to do it before the next appointment. (Tr. 233). The record does not state whether Ms. Hartson contacted the Sexual Abuse Center as instructed. At this meeting, Ms. Jones assigned Ms. Hartson a new homework assignment and reported that Ms. Hartson was doing "quite well" with the therapy. (Tr. 233). Ms. Jones assigned Ms. Hartson a GAF of 60, her highest score since she initiated treatment in September 2002. (Tr. 233).

On April 18, Ms. Hartson met with Dr. Ekholm again for a 15-minute session. (Tr. 278). She requested that Dr. Ekholm change her prescription to Depakote, instead

of Trileptal, because the free clinic could only find Depakote. (Tr. 278). Dr. Ekholm changed the prescription. (Tr. 278). By her next April meeting with Ms. Jones, Ms. Hartson had written the letter to her husband but failed to complete the rest of the assigned homework. (Tr. 277). Ms. Hartson and Ms. Jones discussed Ms. Hartson's previous suicide attempts. (Tr. 275). This conversation led Ms. Jones to add a diagnosis of borderline personality disorder to Ms. Hartson's evaluation. (Tr. 275, 277). Ms. Jones assigned a GAF of 60 at this meeting. (Tr. 277).

By the next appointment, May 12, 2003, Ms. Hartson was still struggling to complete assigned homework. (Tr. 274). She claimed this was due to unstable living conditions. (Tr. 274). She also claimed that she was eating all the time but had not heard the voices in awhile. (Tr. 274). At this meeting, Ms. Jones removed the diagnosis of borderline personality disorder from her report and gave Ms. Hartson a GAF of 60. (Tr. 274). Dr. Ekholm met with Ms. Hartson on May 21, 2003, and reported that Ms. Hartson was "the best she's ever looked." (Tr. 272). At her next 60-minute meeting with Ms. Jones, on May 23, Ms. Hartson spoke of continued improvement and revealed that she was not lying to her husband anymore. (Tr. 270). Although Ms. Hartson did not do her homework again, Ms. Jones noted that Ms. Hartson was "feeling more positive about her life." (Tr. 270). Again, Ms. Jones assigned a GAF of 60. (Tr. 271).

The next meeting on record was a 15-minute meeting with Dr. Ekholm, on July 22, 2003. (Tr. 269). The "Progress Note" from the meeting states that Ms. Hartson had "good control of her temper" and that her "sleep, appetite, and energy [were] good." (Tr. 269). Dr. Ekholm pushed back their next appointment to three months. (Tr. 269). They met again in October and Ms. Hartson "denie[d] anything suggestive of mania or depression since [the] last visit." (Tr. 268). However, Dr. Ekholm requested that they meet again in a month. (Tr. 268). They met in November. (Tr. 266). Ms. Hartson reported that she was doing well and denied anything "suggestive of mania or psychosis." (Tr. 266). Dr. Ekholm did not require Ms. Hartson to return for three months. (Tr. 266).

In November 2003, Ms. Hartson received a letter from the Abbe Center about her failure to attend scheduled appointments with Ms. Jones. (Tr. 267). The letter stated that if she missed one more appointment, she would not be able to visit the Abbe Center for therapy again. (Tr. 267). Ms. Hartson came to her appointment on November 13, 2003, and expressed a desire to resume therapy to deal with abuse issues from her childhood. (Tr. 264). Ms. Jones reported that Ms. Hartson's mood swings were better controlled and that she appeared motivated. (Tr. 264). Ms. Jones assigned a GAF of 60 (Tr. 264).

Ms. Jones met with Ms. Hartson again on December 16, 2003. (Tr. 262). Ms. Hartson claimed she only had one day worth of Zyprexa left, so Ms. Jones scheduled an appointment the following day with Dr. Ekholm. (Tr. 262). Ms. Hartson also stated that she was waiting for her husband to file for a divorce because she could not pay to file for one herself. (Tr. 262). The therapy session was not productive, primarily because Ms. Hartson brought a friend. (Tr. 262). Ms. Hartson also did not complete her homework assignment, a letter to her abuse perpetrators, but indicated she would complete by the next appointment. (Tr. 262). Ms. Jones questioned whether Ms. Hartson was really interested in therapy and assigned a GAF of 60. (Tr. 262-63).

At their next appointment, Ms. Hartson still did not complete the assignment because she claimed she did not have paper. (Tr. 260). She reported to Ms. Jones that she had a new boyfriend and Ms. Jones noted that Ms. Hartson's mood swings were stable and that she was sleeping well, eating well, not hearing voices, and not crying. (Tr. 260). Ms. Jones also reported that Ms. Hartson's concentration was better, her energy was good, and her anxiety decreased. (Tr. 260). Ms. Hartson wanted to meet again and agreed to do the homework by the next appointment. (Tr. 261). Ms. Jones assigned a GAF of 60. (Tr. 261).

Ms. Hartson met with Dr. Ekholm in February 2004 for a 15-minute session. (Tr. 259). Dr. Ekholm commented on how Ms. Hartson "weathered the storms of separating from her husband yet again, moving in with her sister, and then having to move

out to her mother's after it became apparent that her sister was engaged in prostitution."
(Tr. 259). Dr. Ekholm continued the Zyprexa and Depakote prescriptions and requested
another meeting in three months. (Tr. 259). In March 2003, Ms. Jones and Ms. Hartson
met again. (Tr. 257). At this meeting, Ms. Jones reported that they did not get to actual
therapy because she had to help Ms. Hartson complete a number of forms for medication
and food stamps. (Tr. 257). Notably, Ms. Hartson completed a homework assignment
by writing a letter to her father. (Tr. 257). Ms. Jones assigned a GAF of 60. (Tr. 257).

Ms. Hartson had an appointment scheduled prior to April 2; however, the next
meeting with Ms. Jones on record is in May. (Tr. 255, 258). At their May meeting,
Ms. Jones and Ms. Hartson discussed Ms. Hartson's history with ADHD. (Tr. 255).
Ms. Jones reported that Ms. Hartson met virtually every criteria for ADHD, including
distractibility and inattention. (Tr. 255-56). Ms. Jones confirmed Ms. Hartson's diagnosis
with ADHD from a February 2003 progress note. (Tr. 256). Again, Ms. Jones assigned
a GAF of 60. (Tr. 256).

Ms. Hartson met with Dr. Ekholm in June 2004 and continued the prescriptions of
Zyprexa and Depakote. (Tr. 254). Dr. Ekholm met Ms. Hartson again in September 2004
and Ms. Hartson said she felt much better. (Tr. 245). Dr. Ekholm stated that it
"appear[ed] the hypomania ha[d] pretty much resolved." (Tr. 245).

In August 2004, on Ms. Jones's referral, Ms. Hartson also met with Ms. Carol
DePaepe, a nurse clinician at the Abbe Center, to investigate Community Support
Programs (CSP). (Tr. 246). At their first meeting, Ms. DePaepe prepared an intake
assessment on Ms. Hartson based on information provided by Ms. Hartson and on
information at the Abbe Center. (Tr. 246). Ms. Hartson stated that she was placed in a
group home as a teenager, until she was 17, because she ran away from home multiple
times. (Tr. 246). She claimed that she began noticing problems with depression at that
time and put a gun to her head with suicidal intentions. (Tr. 246). Ms. DePaepe reported
that Ms. Hartson had a history of jobs but was not able to keep them primarily for poor

attendance. (Tr. 248). Her longest work experience was a year-long position as a flagger, but she voluntarily left that job to care for her then husband's aunt. (Tr. 252). Ms. Hartson had a positive history of street drug use, including pot, coke, PCP, and acid. (Tr. 252). However, she claimed that this drug use only occurred until about age 18. (Tr. 252). Ms. Hartson claimed to occasionally drink beer, but "state[d] that she made up her mind to quit drinking and was able to do that on her own." (Tr. 252).

Ms. Hartson applied for social security benefits on November 6, 2002. (Tr. 58). She claimed the onset date for her disability as August 1, 2002, approximately six weeks before she began the above treatments at the Abbe Center. (Tr. 58, 185). Dr. Ekholm provided information for Ms. Hartson on various occasions during the application process. On December 12, 2002, Dr. Ekholm wrote the Disability Determination Services Bureau and stated that he and Ms. Susan M. Blome, the Crisis Services Coordinator at the Abbe Center, felt "Ms. Hartson [was] capable of handling cash benefits on her behalf." (Tr. 196). Dr. Ekholm and Ms. Blome signed a letter making the identical statement on April 14, 2003. (Tr. 234).

Ms. Hartson's attorney also contacted Ms. Jones to fill out a mental impairment questionnaire. (Tr. 236). Ms. Jones replied with a letter on June 23, 2003, refusing to fill out the questionnaire until she established an ongoing therapeutic relationship with Ms. Hartson. (Tr. 236). Ms. Jones cited Ms. Hartson's numerous no-shows for appointments with both Ms. Jones and Dr. Ekholm as a primary reason Ms. Jones had not established a proper relationship with Ms. Hartson. (Tr. 236). In that letter, Ms. Jones also questioned how interested Ms. Hartson was in therapy. (Tr. 236).

In February 2003 a state psychologist examined Ms. Hartson's records. (Tr. 202). The report found that Ms. Hartson suffered from bipolar disorder and that she had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 205, 212). The final report also stated that despite her WAIS-III scores, "the preponderance of the medical evidence of record would indicate

[Ms. Hartson] functions at a much higher level adaptively." (Tr. 221). This evidence included "no mention of severe learning disabilities or mental retardation" in the Abbe Center records or in Dr. Ekholm's reports. (Tr. 220-21). It also included indications from Ms. Hartson's "Activity of Daily Living" (ADL) questionnaire. (Tr. 220-21). The state psychologist concluded that the questionnaire was in Ms. Hartson's handwriting and that the "spelling and use of grammar suggest[ed] a higher level of adaptive functioning." (Tr. 220). The ADL also showed that Ms. Hartson could drive, use public transportation, and read books. (Tr. 220).

On December 30, 2004, Dr. Ekholm filled out a mental impairment questionnaire for Ms. Hartson's attorney. (Tr. 238). In the questionnaire, Dr. Ekholm stated that Ms. Hartson suffered from bipolar/hypomania and checked symptom boxes including: anhadonia or pervasive loss of interest in almost all activities; decreased energy; thoughts of suicide; blunt, flat or inappropriate effect; feelings of guilt or worthlessness; mood and affect disturbance; substance dependence; intense and unstable interpersonal relationships and impulsive and damaging behavior; hallucinations or delusions; emotional lability; emotional withdrawal or isolation; bipolar syndrome with history of full symptomatic picture of both manic and depressive syndromes; and decreased need for sleep. (Tr. 238-40).

Dr. Ekholm also checked boxes in the questionnaire stating Ms. Hartson had limited but satisfactory abilities to interact appropriately with the general public and adhere to basic standards of neatness and cleanliness. (Tr. 242). However, Dr. Ekholm checked boxes showing that Ms. Hartson was seriously limited, but not precluded; was unable to meet competitive standards; or had no useful ability to function in the remaining aptitudes. (Tr. 241-42). Specifically, Dr. Ekholm checked boxes stating that Ms. Hartson had no useful ability to function in aptitudes regarding her ability to: maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a

consistent pace without an unreasonable number and length of rest periods; deal with normal work stress; or set realistic goals or make plans independently of others. (Tr. 241-42). Finally, Dr. Ekholm checked boxes stating that the Ms. Hartson did not have a low IQ or reduced intellectual functioning, had a current history of being unable to function outside a highly supportive living arrangement, and would miss more than 4 days of work per month. (Tr. 242).

The ALJ conducted a hearing on January 12, 2005. (Tr. 300). Ms. Hartson testified to her special education background, learning and hyperness problems, difficulties with reading, and problems filling out forms. (Tr. 301-02). She also testified to her past work experience as a flagger, house cleaner, and home healthcare person. (Tr. 303). She described her struggles with these jobs in keeping an appropriate work pace and dealing with people. (Tr. 303-10). Ms. Hartson recounted her symptoms, including hyperness, slow learning, lost interest in activities, lack of energy, suicidal thoughts, inability to concentration, and discomfort around people. (Tr. 303-12). She also testified that she did not know why Dr. Ekholm checked the substance dependence box on the questionnaire. (Tr. 312). Ms. Hartson denied any current substance use, although admitted dependency in the past. (Tr. 312). She described her current lifestyle where she lived with her mother and sister-in-law and helped care for her nephew, cook, and clean. (Tr. 310). The ALJ questioned Ms. Hartson about her work experience as a home health care aid, house cleaner, and flagger. (Tr. 313-15). Ms. Hartson could not recall whether she received unemployment after quitting her job as a flagger. (Tr. 314-15).

Ms. Katherine Lacey, Ms. Hartson's sister-in-law, also testified at the hearing. (Tr. 315). She stated that Ms. Hartson did not handle stress well and that she was very moody. (Tr. 316). She also testified to Ms. Hartson's inability to handle social situations and her need for help filling out forms and reading bills. (Tr. 317-18).

Ms. Carma Mitchell, a vocational expert, was the final witness at the hearing. (Tr. 319). She testified that in her opinion, Ms. Hartson could return to all her past

relevant work or perform unskilled work such as a laundry worker I, cleaner II, or salvager. (Tr. 321-22). However, Ms. Mitchell stated that in a hypothetical involving a person with the symptoms Dr. Ekholm checked in the questionnaire, a person would be unemployable. (Tr. 322-23). These symptoms included inabilities to: maintain attention for two-hour segments, maintain regular attendance and be punctual within strict tolerances, stand an ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, complete a normal workday or work week without interruption, perform at a consistent pace without an unreasonable number or length of rest periods, respond appropriately to changes in workplace, deal with normal work stress, carry out detailed instructions, set realist goals, make plans individually of others, deal with stress at semi-skilled or skilled work, travel unfamiliar places, and use public transportation. (Tr. 323). Ms. Mitchell also testified that a person that was going to miss more than three or four days of work per month was unemployable. (Tr. 323). Finally, Ms. Mitchell stated that if a person had marked difficulty in maintaining social functioning and deficiencies in concentration, persistence, and daily living, these traits would further preclude competitive employability. (Tr. 323-24).

## CONCLUSIONS OF LAW

### Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be "supported by substantial evidence in the record as a whole." Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). "Substantial evidence 'is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Maresh, 438 F.3d 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse v. Bowen, 867 F.2d 1183, 1184 (quoting

Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)).  In making a decision, a court should "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it."  Maresh, 438 F.3d 898 (8th Cir. 2006) (quoting McKinney, 228 F.3d 860, 863 (8th Cir. 2000)).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

ALJ's Determination of Disability

The court uses a five-step process to determine if a claimant is disabled.  See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The five steps are:

> (1)  If the claimant is engaged in substantial gainful activity, disability benefits are denied.
>
> (2)  If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is not severe, benefits are denied.
>
> (3)  If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity.  If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
>
> (4)  If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.  If the claimant is able to perform her previous work, she is not disabled.
>
> (5)  If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the above analysis, the ALJ determined that the plaintiff had not engaged in substantial gainful employment since her alleged onset date of August 1, 2002. (Tr. 20). With respect to the second step, the ALJ determined that the Ms. Hartson's bipolar disorder and "additional impairments involving ADHD and a learning disability" were not "severe." (Tr. 20). At the third step, the ALJ determined that the Ms. Hartson's impairments were not equivalent to one of the listed impairments. (Tr. 23). Under the fourth and fifth steps, the ALJ determined that based upon her residual functional capacity (RFC), Ms. Hartson was able to perform work as she had done in the past as well as other jobs in the national economy. (Tr. 25). Therefore, the ALJ determined that Ms. Hartson was not "disabled" within the meaning of the Social Security Act, as amended. (Tr. 25).

### The ALJ's Determination that Ms. Hartson Does Not Meet the Listing for Mild Mental Retardation

Ms. Hartson argues that the ALJ erred in the third step by finding that she did not meet a listed impairment. Ms. Hartson claims that she meets the criteria for a finding of disability under 12.05C of 20 C.F.R. part 404, subpart P, appendix 1, which addresses mental retardation. Section 12.05 provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the

evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.    Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B.    A valid verbal, performance, or full scale IQ of 59 or less;

Or

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1.    Marked restriction of activities of daily living; or
2.    Marked difficulties in maintaining social functioning; or
3.    Marked difficulties in maintaining concentration, persistence, or pace; or
4.    Repeated episodes of decompensation, each of extended duration.

Ms. Hartson specifically claims that substantial evidence shows that she has an IQ of 70 or less. She contends that Dr. Duffy's WAIS-III test results, which yielded results below 70, and Dr. Duffy's conclusion that Ms. Hartson had mild mental retardation are substantial evidence of her disability. Ms. Hartson also argues that the ALJ incorrectly relied on the state agency psychological consultant's conclusions because those conclusions were based upon the incorrect assumption that Ms. Hartson's daily-activities report (ADL)

was completed in her own handwriting. Ms. Hartson claims that the handwriting on the ADL is the same handwriting as on the report submitted by her husband.

The defendant counters that substantial evidence on the record as a whole supports a finding that Ms. Hartson has a valid IQ above 70. The defendant argues that Ms. Hartson's claim of an adequately low IQ score rests almost entirely on Dr. Duffy's conclusions and IQ test results. The defendant claims that the ALJ properly discredited Dr. Duffy's opinion because it was unsupported by the record, specifically by Ms. Hartson's own reports of her ability to function and by the opinion of the State agency medical consultant.

"The Commissioner is not required to accept a claimant's I.Q. scores, however, and may reject scores that are inconsistent with the record." Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). The question on review then becomes "whether the decision to disregard [the claimant's] scores as unreliable is supported by substantial evidence in the record as a whole." Id. "A one-time evaluation by a non-treating psychologist is not entitled to controlling weight." Id. (citing Loving v. Dept. of Health & Human Serv., 16 F.3d 967, 971 (8th Cir. 1994)). Further, scores which are inconsistent with a claimant's daily activities and prior medical record may be disregarded. Id. at 1256. Finally, "[u]nder the plain language of the regulations, a claimant must demonstrate or support onset of the impairment before age 22." Maresh, 438 F.3d at 899.

Dr. Duffy was a non-treating physician who performed a one-time evaluation of Ms. Hartson. Thus, his opinion is not entitled to controlling weight. Clark, 141 F.3d at 1255. Further, his results are not consistent with the record and do not adequately demonstrate the on-set of her disability prior the age of 22.

Multiple IQ tests administered to Ms. Hartson prior to age 22 yielded test results showing an IQ greater than 70.[2] In 1978, at approximately 6 years old, Ms. Hartson took

[2]Although the ALJ did not rely on the IQ tests to reach its decision, this court may
(continued...)

18

the WISC-R and scored a Verbal IQ of 72, Performance IQ 81, and Full-Scale IQ of 80. (Tr. 109). In January 1983, at approximately 11 years old, Ms. Hartson took the WISC-R again and scored a Verbal IQ of 81, Performance IQ of 78, and Full-Scale IQ of 78. (Tr. 109). She retook the test in 1985, at the age of 13, and scored a Verbal IQ of 72, Performance IQ of 90, and Full-Scale IQ of 90. (Tr. 175). Ms. Hartson contends that her Verbal IQ score of 72 places her in the range of mild mental retardation. Although this score is above 70, Ms. Hartson claims that the five-point range of error in a Wechsler IQ test places her score in the possible range of 67-77. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 39-41 (4th ed. 1994) [hereinafter DSMV-IV]. Regardless, however, these scores are not presumptive evidence that Ms. Hartson does not meet the listing because they were performed before she was 16 years old. 20 C.F.R. pt. 404, Subpt. P, App. 1, § 1212.00D.10. When evaluating children, IQ tests taken before the age of 16 are considered to have limited validity because results of IQ tests do not tend to stabilize until a person is 16 years old. Id.

---

[2](…continued)

uphold an agency decision based on reasons not articulated by the ALJ when the ALJ did not "fail to make a necessary determination of fact or policy." Banks v. Massanara, 258 F.3d 820, 824 (8th Cir. 2001) (quoting Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala, 164 F.3d 415, 418 (8th Cir. 1998) (discussing the limitations on the rule made by the Supreme Court in S.E.C. v. Chenery Corp., 318 U.S. 80 (1943)).

As the Supreme Court stated in Chenery:

[W]e do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason. The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground.

Ark. AFL-CIO v. F.C.C., 11 F.3d 1430, 1440 (8th Cir. 1993) (quoting Chenery, 318 U.S. at 88).

The only other IQ test on record came in 2002, when Ms. Hartson was 30 years old. In that case, Dr. Duffy administered the WAIS-III and Ms. Hartson scored a Verbal IQ of 61, Performance IQ of 64, and a Full-Scale IQ of 59.[3] (Tr. 199). Although Ms. Hartson took this test after the age of 22, the Eighth Circuit, in Maresh, held that a 37 year old claimant's valid IQ test score of 70 was evidence that mental retardation set-in before the age of 22 because "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." Maresh, 438 F.3d at 900 (quoting Muncy, 247 F.3d at 734).

Ms. Hartson also contends that her special education experience is indicative of the onset of her disability before age 22. The record shows that Ms. Hartson was considered for special education as early as 1979 and placed in special education in 1983. (Tr. 95, 108). In 1985, the school psychologist reevaluated Ms. Hartson and cited her below average intelligence, depressed academic skills, and problems with social adaptability as reasons for keeping her in special education. (Tr. 174). She only completed the ninth grade. (Tr. 198). In Maresh, the Eighth Circuit held that a claimant with similar childhood experiences and an adequately low IQ score on a test taken after the age of 22 presented substantial evidence of the onset of the disability prior to age 22. Maresh, 438 F.3d at 900.

However, as opposed to Maresh, in this case there is other evidence on the record indicating that Ms. Hartson may not currently be disabled or have been disabled prior to age 22. In addition to Ms. Hartson's IQ test scores above 70, the state psychiatrist disagreed with Dr. Duffy's assessment and stated that Ms. Hartson appeared to function at a higher" adapative level than mild mental retardation." (Tr. 220). Ms. Hartson contends that the state psychiatrist's report should be discredited because of handwriting

_____

[3]Notably, a conclusive score of 59 would be low enough to qualify Ms. Hartson for a listed impairment based solely on her IQ test score. See 20 C.F.R. Subpt. P, App. 1, § 12.05B.

discrepancies, however, Ms. Hartson testified that although she had help with documents, she usually filled them out. (Tr. 302). Further, the state psychiatrist relied on other information besides handwriting in the ADL to make the determination. The state psychiatrist cited Ms. Hartson's abilities to drive, use public transportation, and read as indications from her ADL that Ms. Hartson operated at a higher adaptive level than her test scores showed. (Tr. 220).

Additionally, Dr. Ekholm, Ms. Hartson's treating physician, checked "no" on the questionnaire when asked whether Ms. Hartson had "a low IQ or reduced intellectual functioning." (Tr. 242). This is despite the fact that Dr. Ekholm's questionnaire listed Ms. Hartson as quite limited in other areas. (Tr. 241-44). This answer is consistent with Dr. Ekholm's previous meeting assessments stating that Ms. Hartson's "[i]ntellect appear[ed] to be within normal limits." (Tr. 186, 191). Dr. Ekholm also stated on two occasions that Ms. Hartson was capable of handing cash benefits. (Tr. 196, 234). This represents another inconsistency with Dr. Duffy's report. (Tr. 200). In light of this, there is substantial evidence that Dr. Duffy's results are inconsistent with the record and that Ms. Hartson does not have an IQ below 70. Given the presumption in favor of the ALJ's decision, this court does not find sufficient substantial evidence to reverse the ALJ's conclusion that Ms. Hartson does not meet the § 12.05C listing.[4] Therefore, the court will not disturb the ALJ's finding.[5]

---

[4]Based on this evidence, the court also concludes that Ms. Hartson does not meet the 12.05B listing for an IQ of 59 or lower. 20 C.F.R. Subpt. P, App. 1, § 12.05B.

[5]Based on this conclusion, the court does not need to consider the second prong of § 12.05C that requires a finding that Ms. Hartson has "a physical or mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.05C.

Upon the foregoing,

IT IS ORDERED that this matter be resolved in favor of the defendant and the matter be dismissed.

January 24, 2007.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT